UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSE ZAPATA,

              Plaintiff,

     v.

CLARK DUCART, et al.,

              Defendants.

Case No. 17-cv-02557-EMC

**ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REFERRING CASE TO MEDIATION PROGRAM**

Docket Nos. 26, 32

## I.      INTRODUCTION

In this *pro se* prisoner's civil rights action, Jose Zapata complains about the denial of his request for a religious diet at Pelican Bay State Prison. Defendants have filed a motion for summary judgment, which Mr. Zapata has opposed. For the reasons discussed below, Defendants' motion for summary judgment will be denied. The Court will refer this case to the *Pro Se* Prisoner Mediation Program.

## II.      BACKGROUND

The following facts are undisputed unless otherwise noted.

A.    The Parties and Relevant Time Period

The relevant time period in this action is from August 2016 through June 2017, when Mr. Zapata was a prisoner housed at Pelican Bay State Prison. In June 2017, he was transferred from Pelican Bay to the California State Prison – Los Angeles County, where he remains in custody. Mr. Zapata is a "Messianic Jew." Docket No. 1 at 5.

Four Defendants remain in this action. Robert Losacco was a community resource manager at Pelican Bay and was responsible for the religious diet program at Pelican Bay. Docket

No. 26-8 at 1. Mr. Losacco also was a member of the Religious Review Committee at that prison. *Id.* Clark Ducart was the warden at Pelican Bay who denied Mr. Zapata's inmate appeal at the second level. M. Hodges, an appeals examiner, and M. Voong, the chief of the office of inmate appeals, denied Mr. Zapata's inmate appeal at the third level. Docket No. 27 at 37.

A fifth Defendant upon whom the Court had ordered service of process, Rabbi Kreindler, was later voluntarily dismissed by Mr. Zapata. *See* Docket Nos. 20, 21. Rabbi Kreindler allegedly initially denied Mr. Zapata's kosher diet request, using the former regulations. Docket No. 1 at 6.

B.     Kosher Diets In The CDCR

A religious diet program exists in the California Department of Corrections and Rehabilitation (CDCR). At least three religious diets are available for prisoners: vegetarian, kosher, and "religious meat alternate." Cal. Code Regs. tit. 15, § 3054(e) (effective June 29, 2016).

For several years before June 29, 2016, a regulation provided that a "Jewish Kosher Diet" was available to Jewish inmates who had been authorized to participate by a Jewish chaplain. *See* former Cal. Code Regs. tit. 15, § 3054.2(a) (as amended through Feb. 2, 2010) ("Jewish kosher meals shall be available at designated institutions. Jewish inmates may participate in the program, as determined by a Jewish chaplain."); *see also id.* at former § 3054.2(g)(1) (as amended through Feb. 2, 2010) ("A Jewish Chaplain shall . . . [d]etermine inmate entry into the Jewish kosher diet program, oversee the program, and determine Jewish inmate compliance violations.").[1]

Effective June 29, 2016, the regulation regarding the kosher diet was amended. As a result of the amendment, (1) the name of the diet has changed from "Jewish kosher diet" to "kosher diet," (2) the kosher diet is no longer limited to Jewish inmates, (3) the kosher diet can be approved by any chaplain or by the Religious Review Committee (RRC), and (4) the kosher diet

---

[1] Mr. Zapata did not request participation in the kosher diet until a couple of months after the June 29, 2016, amendment to this regulation. The former version of the regulation is mentioned because Mr. Zapata devoted a substantial part of his inmate appeal and his opposition brief in this Court to argue that prison officials erroneously applied the outdated regulation to his request for a kosher diet.

can be *denied* only by the RRC (and not by a chaplain). *See* Cal. Code Regs. tit. 15, § 3054.2 (as amended effective June 29, 2016).[2]

To request any religious diet, a prisoner must fill out a CDCR-3030 form and submit it to any chaplain. *See* Cal. Code Regs. tit. 15, § 3054.4(a). The "Chaplain or designated representative of the RRC" will interview the prisoner and determine his eligibility for the requested diet. *Id.* at § 3054.4(b).

The CDCR-3030 form lets the prisoner state the diet he requests and lets the inmate attach documentation in support of his request. The CDCR-3030 form also requires the prisoner to sign an agreement to the conditions for the diet that states, in part, that he will not buy or consume food

---

[2] The regulation now provides, in relevant part:

> (a) Kosher meals shall be available at designated institutions for inmates with a religious dietary need that cannot be met by another religious diet option or by the mainline diet. Inmates may seek participation in the Kosher Diet Program by submitting to any Chaplain a CDCR Form 3030, Religious Diet Program Request. The Chaplain may approve the Form 3030 request or refer it to the Religious Review Committee (RRC) for determination.
>
> . . . .
>
> (c) Inmates shall not give away, trade, or sell any portion of a kosher meal. Doing so may result in a compliance violation of the Religious Diet Program Agreement.
>
> . . . .
>
> (g) The Kosher Diet Program shall be administered in accordance with the provisions of this Article.
>
> (1) A Chaplain designated by the RRC shall annually review each institution's processes for the procurement, storage, and distribution of Kosher Diet Program meals, and shall provide a report of the review to the Correctional Food Manager (CFM).
>
> (2) Upon review of the CDCR Form 3030, Religious Diet Program Request, any Chaplain or the RRC shall determine inmate entry into the Kosher Diet Program.
>
> (3) Only the RRC may make the determination to deny the CDCR Form 3030, Religious Diet Program Request.
>
> (4) The RRC shall determine inmate compliance violations.

Cal. Code. Regs. tit. 15, § 3054.2 (effective June 29, 2016).

incompatible with his requested diet. Docket No. 26-6 at 19 ("I understand that in order for me to participate in a Religious Diet Program, specific foods may be purchased and specialized food preparation practices may be utilized. Therefore I agree to the following conditions: . . . I may not purchase or consume any food items that are not part of my religious diet. I understand that my quarterly packages and canteen purchases may be routinely monitored."). The agreement further provides that the prisoner will be warned the first time he violates a condition of the religious diet and may be removed from the Religious Diet Program if he violates the conditions a second time within six months following a previous violation (although he may reapply six months thereafter). *Id.*

Defendants present undisputed evidence that the same considerations apply when deciding whether a prisoner may participate in the kosher diet program, regardless of whether he is a Messianic Jew or a traditional Jew. According to chaplain Shefflar, the Jewish chaplain at San Quentin:

> Both faiths base their kosher requirements on the Torah, a collection of books commonly referred to as the Old Testament or the Jewish Bible. Specifically, passages in the Book of Deuteronomy and the Book of Leviticus describe kosher dietary requirements. While Judaism and Messianic Judaism have many key differences, some of which are profound, the kosher diet requirements, also known as 'kashrut,' are identical, based as they are on the exact same scripture. Docket No. 26-4 at 2.

C.     Mr. Zapata Requests a Kosher Diet

Mr. Zapata submitted a CDCR-3030 "religious diet program request" form dated August 27, 2016, requesting that he be provided a kosher diet and listing his religious/spiritual affiliation as "Judeo-Christianity/Messianic Judasim." Docket No. 26-6 at 18 (error in source). In an attachment to his form, he discussed his religious practices and need for the kosher diet, as well as his argument that his request had to be processed under the new regulations and that he could not be denied a kosher diet just because he was not Jewish. *Id.* at 20-26.

Mr. Zapata submitted a CDCR-22 "inmate/parolee request for interview, item or service" form dated August 28, 2016, stating that he wanted to be put on a kosher diet, and explaining that he had previously submitted a request and had been told that it had to be submitted to the Rabbi;

4

he urged that, under the new regulation, "any qualified chaplain has the authority to grant my request. Chaplains are still unaware, please notify them." Docket No. 26-6 at 13. A "staff response" dated August 31, 2016, on that same CDCR form 22 stated "We met yesterday and the application is being forwarded." *Id.*

There is another CDCR form 22 "inmate/parolee request for interview, item or service" with multiple dates on it from Mr. Zapata, which has no written response from staff. In the portion dated September 11, 2016, Mr. Zapata stated he was sending the request to Mr. Losacco and that he (Zapata) was trying to follow the new regulatory procedure "but was subject to former procedure" for his religious diet request. Docket No. 26-6 at 14.

Mr. Losacco learned of Mr. Zapata's concern about the absence of a response to his application for a kosher diet. According to Mr. Losacco, the processing of the application had been delayed because it had been assigned to a chaplain who had cut back on his hours and eventually left the job, creating a "slight backlog of work that he had been assigned." Docket No. 26-8 at 2. Mr. Losacco spoke to Mr. Zapata and they "agreed that [Zapata] would submit a new application that [Losacco] would personally shepherd through the process and provide him with a decision on the request." Docket No. 26-8 at 2.

Mr. Zapata thus submitted a new request for a kosher diet dated October 1, 2016. Docket No. 26-8 at 9. The October 1, 2016 request is the one that was processed through completion.

The chaplain who reviewed the October 1 request referred the matter to the RRC. (Recall that, under the regulation, a chaplain can grant but cannot singlehandedly deny a request and instead must send it to the RRC for consideration.) The RRC denied Mr. Zapata's request on or about November 14, 2016 based on his lack of understanding of the kosher requirements of his professed faith and his history of purchasing nonkosher items from the canteen. Docket No. 26-8 at 2, 4. Mr. Losacco sent to Mr. Zapata a letter dated November 14 that stated:

> Your CDCR 3030, Religious Diet Request, was sent to the RRC religious diet subcommittee. Based on the information that you provided, which was carefully reviewed, you are being denied entrance into the [Jewish Kosher Diet (JKD) program]. In most cases when an inmate is denied, it is due to the fact that they were not able to satisfactorily demonstrate to the RRC that Judaism is their truly held religious belief. Either you are unfamiliar with

Jewish law or the Shabbat. The reasons you gave in your appeal and the answers you gave the Rabbi to his questions during the CDCR 3030 interview process, did not show that you are following/have self-discipline and devotion to Hashem. This of course, doesn't preclude you from the JKD ever. Study the Torah, specifically the sections that cover the Sabbath, what you can and cannot eat, and why. Be sure to observe Jewish holidays; get a Jewish calendar if you do not already have one. Be cognizant of your canteen draws and make sure that you don't accidentally order items that are not kosher. You may reapply six months after the date your denial was issued. In the meantime, you can be offered a least restrictive alternative in the form of a vegetarian diet or the religious meat alternative diet. [¶] I hope this has addressed your concerns. If you have any further questions or need advice please feel free to contact me or any of the chaplains.

Docket No. 26-6 at 12. On the CDCR-3030 form itself, Mr. Losacco gave a blunter assessment and wrote in the "comments" box: "It is very evident that inmate Zapata has no clue as to Kosher or being Jewish." Docket No. 26-8 at 9.

Mr. Zapata states in his verified complaint that he "denies" the statements that he failed to provide sufficient answers about why he should receive the kosher diet. Docket No. 1 at 6.

Mr. Zapata did not apply for the kosher program again while he remained at Pelican Bay, where he was housed for another eight months.

In June 2017, Mr. Zapata was transferred to the California State Prison – Los Angeles County (CSP-LAC). He did not apply for that prison's kosher diet program for six months. When Mr. Zapata finally applied, the CSP-LAC officials made their own assessment regarding his request: he was interviewed by a chaplain, who referred the matter to that prison's RRC, which denied the request on December 26, 2017. The RRC at CSP-LAC determined that Mr. Zapata's responses to the required questions did not demonstrate a need for a religious diet. As of October 3, 2018 (i.e., the day before the motion for summary judgment was filed), Mr. Zapata had not renewed his request. Docket No. 26-7 at 3.

D.   Mr. Zapata Regularly Purchases Nonkosher Food From The Canteen

Pelican Bay provides a canteen service that allows prisoners to purchase food, toiletries and miscellaneous items for personal use. Docket No. 26-1 at 1. To obtain items from the canteen, a prisoner submits an order form on which he checks the items he wants, after which his account is checked and funds are deducted to pay for the items that are then provided to the

prisoner.  The order form contains information to assist prisoners who are following religious diets that require them to keep kosher.  Specifically, a bold "K" appears on the order form next to the price of each food item that is kosher.  *Id.* at 2.  This allows prisoners keeping kosher to avoid nonkosher items.

The Pelican Bay canteen manager provided a copy of a printout of Mr. Zapata's canteen purchasing history for the period of September through November 2016 to the Religious Review Committee in November 2016.  Docket No. 26-1 at 1.  That list shows that Mr. Zapata bought at least four nonkosher food items that were marked as nonkosher foods on the order form.  *See* Docket No. 26-1 at 5-10.  Specifically, he bought four strawberry crush sodas.  Docket No. 26-1 at 10.  He also bought 73 packets of "ramen chili," *id.*, which may or may not have been kosher as the only two chili products listed on the order form, *id.* at 5, are not marked as being kosher.

After his kosher diet request was denied, Mr. Zapata bought numerous nonkosher items from the prison canteens at Pelican Bay and CSP-LAC.  Prison canteen purchasing history reports show that, from January 2017 through September 2018, Mr. Zapata "has consistently and repeatedly purchased nonkosher food products, including pork rinds, sausages, chili and smoked oysters, among other nonkosher items.  In all, 411 nonkosher food items were purchased by Zapata during that period."  Docket No. 26-3 at 2.

Mr. Zapata acknowledges that he bought nonkosher items, but indicates that he is giving them to fellow inmates.  Docket No. 27 at 18 ("when asked to bless a fellow inmate with a certain canteen item 'I do,' obeying Christ command to bless and give to those who request of you.").  He further declares that he "does not habitually purchase" nonkosher items for consumption.  *Id.*

E.    Mr. Zapata's Inmate Appeals

Mr. Zapata filed an inmate appeal about his religious diet issue on October 4, 2016.  Docket No. 26-6 at 8-11.  (This inmate appeal was filed before the RRC had acted on his request.)

In his inmate appeal, Mr. Zapata described his problem thusly:

> I've requested to participate in the Religious Diet Program CCR Title 15 § 3054.2(a)-(e) amended regulations in order to practice my religious and spiritual beliefs.  I have followed the new standerized procedure for religious diets but this regulation is of no effect in Pelican Bay.  My attempt to submit my kosher diet request was

subject to the former procedure of going through the Rabbi cause he's Jewish handling Jewish Kosher Diets. Depriving me of a fair, equal and neutral determination of my participation in the Religious Diet Program in violation of § 3054.2(a)-(d), and (In re Garcia (2012) 202 Cal. App.4th 892), also the Federal Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA). Even if the Religious Review Committee made a consideration for eligibility but denied the request its determination is unlawful because the proper procedure was not followed, any other chaplain could have granted my request but never had the opportunity to do so.

Docket No. 26-6 at 8, 10 (errors in source). The inmate appeal did not identify wrongdoing staff by name, although it did have attached a CDCR-22 form that had been sent to "CRM R. Lasaco" and complained about the handling of Mr. Zapata's religious diet request. Docket No. 26-6 at 14. In the "action requested" portion of the form, Mr. Zapata stated that he wanted his kosher diet request to be granted and, apparently, to learn the status of his CDCR-3030 form requesting that diet. *Id.* at 8, 10.

The inmate appeal was stamped "bypassed" at the first level. The second-level decision was signed by Defendant Warden Ducart, who denied Mr. Zapata's appeal and listed the "issue" as "Inmate Zapata wants to be approved to be place[d] on the Jewish Kosher Diet (JKD)." Docket No. 26-6 at 7. Warden Ducart wrote that the RRC "has reservations as to your sincerity as it pertains to your truly held religious belief" based on Mr. Zapata's answers to the rabbi during the religious diet request interview and referred Mr. Zapata to the RRC's November 14, 2016, letter for further explanation. The third-level decision, denying the inmate appeal, was signed by Defendants Hodges and Voong. Docket No. 27 at 36-37.

## III.   VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the complaint occurred at a prison in Del Norte County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

## IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In a typical summary judgment motion, a defendant moves for judgment against a plaintiff on the merits of his claim. In such a situation, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

When a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence that would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). On a motion for summary judgment for nonexhaustion, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If the defendant carries that burden, the "burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with the defendant, however. *Id.* If material facts are disputed, summary judgment should be denied, and the "district judge rather than a jury should determine the facts" on the exhaustion question, *id.* at 1166, "in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.* at 1170-71.

9

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Zapata's complaint is made under penalty of perjury and therefore is considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *See id.* at 631.

# V. **DISCUSSION**

A.      Exhaustion of Administrative Remedies

"No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016) (mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and complying with "deadlines and other critical procedural rules." *Id.* at 90.

The State of California provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available administrative remedies within this system, a prisoner must proceed through three formal levels of

1  appeal and receive a decision from the Secretary of the CDCR or his designee. *Id.* § 3084.1(b), §

2  3084.7(d)(3).

3  The amount of detail in an administrative grievance necessary to properly exhaust a claim

4  is determined by the prison's applicable grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218

5  (2007). California prisoners are required to lodge their administrative complaints on a CDCR-602

6  form and are required to "list all staff member(s) involved and shall describe their involvement in

7  the issue. To assist in the identification of staff members, the inmate or parolee shall include the

8  staff member's last name, first initial, title or position, if known, and the dates of the staff

9  member's involvement in the issue under appeal. . . . The inmate or parolee shall state all facts

10 known and available to him/her regarding the issue being appealed at the time of submitting" the

11 inmate appeal. Cal. Code Regs. tit. 15, § 3084.2(a)(3-4).

12 Significantly, however, a prisoner "need not exhaust *unavailable* [remedies]." *Ross*, 136

13 S. Ct. at 1858 (emphasis added). The Supreme Court listed three circumstances in which an

14 "administrative remedy, although officially on the books, is not capable of use to obtain relief."

15 *Id.* at 1859. An administrative remedy is unavailable if: (1) "it operates as a simple dead end—

16 with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is

17 "so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators

18 thwart inmates from taking advantage of a grievance process through machination,

19 misrepresentation, or intimidation." *Id.* at 1859–60. With regard to the second, "incapable of use"

20 sort of unavailable remedy, the Supreme Court explained that this may occur where "some

21 mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at

22 1859. It is not enough that the administrative process is susceptible of multiple reasonable

23 interpretations; rather, the administrative process must be "essentially 'unknowable' – so that no

24 ordinary prisoner can make sense of what it demands." *Id.*

25 The unavailable versus available remedies distinction saves the day for Mr. Zapata.

26 Defendants argue that Mr. Zapata did not exhaust his administrative remedies for his claims

27 against Defendants Ducart, Voong, and Hodges – whose alleged liability rests solely on their

28 actions in denying Mr. Zapata's inmate appeal, i.e., Warden Ducart denied the second-level appeal

United States District Court
Northern District of California

11

and Messrs. Hodges and Voong denied the third-level appeal -- because he did not name them in the one administrative appeal he filed about his religious diet. Under the specific circumstances of this case, the Court concludes that Defendants have not shown that there was an *available* remedy for Mr. Zapata to use to complain about the actions of Defendants Ducart, Voong, and Hodges in denying Mr. Zapata's original appeal.

The administrative appeals system is confusing (at best) and impossible to use (at worst) for a California prisoner attempting to pursue a grievance against an official based on the official's denial of an inmate appeal. No regulation specifically addresses how a prisoner may exhaust administrative remedies if he wishes to complain about the official's denial of the original inmate appeal. Various provisions in the regulations point in different directions, ultimately resulting in a scheme that is, practically speaking, incapable of use to challenge this particular sort of conduct.

First, the time limits pose an almost insurmountable obstacle for a new appeal about the denial of the original appeal.[3] A prisoner must submit an appeal within 30 days of the event or decision being appealed (15 Cal. Code Regs. tit. 15, § 3084.8(b)), yet the third-level decision is not due until 60 days after the third-level appeal is submitted (*id.* at § 3084.8(c)(3)).[4] Thus, the

_____

[3] To reduce confusion, the Court in this section uses the terms "original appeal" and "new appeal" to distinguish between the appeal about the basic prison condition being complained about (i.e., the "original appeal"), and the appeal about the denial of that original appeal (i.e., the "new appeal").

[4] Section 3084.8 of Title 15 of the California Code of Regulations provides, in relevant part:

> (a) Time limits for reviewing appeals shall commence upon the date of receipt of the appeal form by the appeals coordinator.
>
> (b) Except as described in subsection 3084.8(b)(4), an inmate or parolee must submit the appeal within 30 calendar days of:
>
> (1) The occurrence of the event or decision being appealed, or;
>
> (2) Upon first having knowledge of the action or decision being appealed, or;
>
> (3) Upon receiving an unsatisfactory departmental response to an appeal filed.
>
> (4) There shall be no time limits for allegations of sexual violence or staff sexual misconduct.

time to file a new appeal about a second-level denial of the original appeal can expire before the third-level decision is issued on the original appeal. Filing a new appeal about the denial of the original appeal at the second level before the third-level decision is issued on the original appeal may cause the prisoner to run afoul of another provision that appears to allow appeals only for conditions or decisions "that the inmate . . . can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." *Id.* at § 3084.1(a); *see also id.* at § 3084.6(b)(2) (allowing cancellation of appeal if prisoner fails to demonstrate a material adverse effect on his or her welfare).[5] A prisoner may not be able to demonstrate that the second-level denial of the

---

(c) All appeals shall be responded to and returned to the inmate or parolee by staff within the following time limits, unless exempted pursuant to the provisions of subsections 3084.8(f) and (g):

(1) First level responses shall be completed within 30 working days from date of receipt by the appeals coordinator.

(2) Second level responses shall be completed within 30 working days from date of receipt by the appeals coordinator.

(3) Third level responses shall be completed within 60 working days from date of receipt by the third level Appeals Chief.

[5] Section 3084.6 of Title 15 of the California Code of Regulations provides, in relevant part:

(b) An appeal may be rejected for any of the following reasons, which include, but are not limited to:

(1) The appeal concerns an anticipated action or decision.

(2) The appellant has failed to demonstrate a material adverse effect on his or her welfare as defined in subsection 3084(c).

(3) The inmate or parolee has exceeded the allowable number of appeals filed in a 14 calendar day period pursuant to the provisions of subsection 3084.1(f).

. . . .

(15) The inmate or parolee has submitted the appeal for processing at an inappropriate level bypassing required lower level(s) of review, e.g., submitting an appeal at the third level prior to lower level review.

(16) The appeal issue or complaint emphasis has been changed at some point in the process to the extent that the issue is entirely new, and the required lower levels of review and assessment have thereby been circumvented.

original appeal has had a material adverse effect upon his health, safety, or welfare when there is a third-level appeal on the original appeal pending that might (if granted) make the issue moot. But waiting until the third-level decision on the original appeal is issued to then file a new appeal about the second-level denial risks the possibility that the appeal will be cancelled for exceeding the 30-day time limits. The prisoner cannot avoid the time trap by including an allegation in his original appeal that any future denial of that original appeal would be a violation of his rights by the person who denies the appeal because an appeal can be rejected if it is about "an anticipated action or decision." *Id.* at § 3084.6(b)(1).

Second, the conflicting regulations do not allow a prisoner to figure out the appropriate level at which to file a new appeal complaining about the denial of an original appeal or how that appeal will be handled. Take, for example, a prisoner who wants to file a new appeal about a second-level denial of the original appeal. The first level does not appear proper because an

_____

(c) An appeal may be cancelled for any of the following reasons, which include, but are not limited to:

(1) The action or decision being appealed is not within the jurisdiction of the department.

(2) The appeal duplicates an inmate or parolee's previous appeal upon which a decision has been rendered or is pending.

. . . .

(4) Time limits for submitting the appeal are exceeded even though the inmate or parolee had the opportunity to submit within the prescribed time constraints. In determining whether the time limit has been exceeded, the appeals coordinator shall consider whether the issue being appealed occurred on a specific date or is ongoing. If the issue is ongoing, which may include but is not limited to, continuing lockdowns, retention in segregated housing, or an ongoing program closure, the inmate or parolee may appeal any time during the duration of the event; however, the inmate or parolee is precluded from filing another appeal on the same issue unless a change in circumstances creates a new issue.

. . . .

(11) The issue under appeal has been resolved at a previous level.

official cannot review the decision of someone higher in rank. *Id.* at § 3084.7(d)(1)(B).[6] The

---

[6] Section 3084.7 of Title 15 of the California Code of Regulations provides, in relevant part:

(a) All appeals shall be initially submitted and screened at the first level unless the first level is exempted. The appeals coordinator may bypass the first level for appeal of:

(1) A policy, procedure or regulation implemented by the department.

(2) A policy or procedure implemented by the institution head.

(3) An issue that cannot be resolved at the division head level such as Associate Warden, Associate Regional Parole Administrator, CALPIA manager or equivalent.

(4) Serious disciplinary infractions.

(b) The second level is for review of appeals denied or not otherwise resolved to the appellant's satisfaction at the first level, or for which the first level is otherwise waived by these regulations. The second level shall be completed prior to the appellant filing at the third level as described in subsection 3084.7(c).

. . . .

(c) The third level is for review of appeals not resolved at the second level, or:

(1) When the inmate or parolee appeals alleged third level staff misconduct or appeals a third level cancellation decision or action.

(2) In the event of involuntary psychiatric transfers as provided in subsection 3084.9(b).

(d) Level of staff member conducting review.

(1) Appeal responses shall not be reviewed and approved by a staff person who:

(A) Participated in the event or decision being appealed. This does not preclude the involvement of staff who may have participated in the event or decision being appealed, so long as their involvement with the appeal response is necessary in order to determine the facts or to provide administrative remedy, and the staff person is not the reviewing authority and/or their involvement in the process will not compromise the integrity or outcome of the process.

(B) Is of a lower administrative rank than any participating staff. This does not preclude the use of staff, at a lower level than the staff whose actions or decisions are being appealed, to research the appeal issue.

15

second level does not appear to be the proper place to file because an official generally is not allowed to review his own decision-making. *Id.* at § 3084.7(d)(1)(A). And the third level does not appear to be the proper place to file because the appeal can be rejected for not first seeking lower level review. *Id.* at § 3084.6(b)(15).

Finally, the regulations are at least unclear whether an appeal about the denial of an earlier appeal would be allowed at all. An appeal can be cancelled if it duplicates a previous appeal on which a decision has been rendered or is pending. *Id.* at § 3084.6(c)(2). And if an appeal is about an ongoing problem, the prisoner is precluded from filing another appeal on the same issue "unless a change in circumstances creates a new issue." *Id.* at § 3084.6(c)(4).

In sum, the administrative appeals system set up for California prisoners has too many contradictions as to when to file, what level to file at, and whether a new appeal may be filed at all to challenge the denial of an original appeal. The contradictory information and various hurdles set up in the regulations go well beyond mere ambiguities and reach the level of an unnavigable system for the ordinary prisoner wanting to file a new appeal about the denial of an original appeal. The Court therefore concludes that California does not provide an "available" administrative remedy for a prisoner who wishes to grieve that an official reviewing his original appeal has wrongly decided that appeal because the scheme is "so opaque" that it is "practically speaking, incapable of use." *Ross*, 136 S. Ct. at 1859; *see, e.g., Williams v. Priatno*, 829 F.3d 118, 125 (2d Cir. 2016) ("A close review of the regulations shows, contrary to defendants' assertions at

---

(C) Participated in the review of a lower level appeal refiled at a higher level.

(2) Second level review shall be conducted by the hiring authority or designee at a level no lower than Chief Deputy Warden, Deputy Regional Parole Administrator, or the equivalent.

(3) The third level review constitutes the decision of the Secretary of the California Department of Corrections and Rehabilitation on an appeal, and shall be conducted by a designated representative under the supervision of the third level Appeals Chief or equivalent. The third level of review exhausts administrative remedies; however, this does not preclude amending a finding previously made at the third level.

Cal. Code Regs. tit. 15, § 3084.7.

oral argument, that an 'appeal' in Williams's circumstance is, indeed, subject to time limitations and procedural hurdles that in all but the rarest of circumstances would preclude him from pursuing his unfiled and unanswered grievance, and that are, in any event, 'so confusing that . . . no reasonable prisoner can use them.'") (omission in original) (quoting *Ross*, 136 S. Ct. at 1859).

Defendants are not entitled to summary judgment on the affirmative defense of nonexhaustion of administrative appeals because they have not carried their burden to prove that there was an available administrative remedy for Mr. Zapata with regard to the conduct of Defendants Ducart, Hodges and Voong. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc) (reversing district court's grant of summary judgment to defendants on issue of exhaustion because defendants did not carry their initial burden of proving their affirmative defense that there was an available administrative remedy that prisoner plaintiff failed to exhaust).

B.    Religious Freedom Claims

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I. "The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). In order to establish a Free Exercise Clause violation, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests. *See Shakur v. Schriro*, 514 F.3d 878, 883–84 (9th Cir. 2008). "To merit protection under the free exercise clause of the First Amendment, a religious claim must" be rooted in religious belief, rather than secular concerns, and "must be sincerely held; the First Amendment does not extend to 'so-called religions which . . . are obviously shams and absurdities and whose members are patently devoid of religious sincerity.'" *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (omission in original).

Prisoners' religious freedoms also are protected by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. RLUIPA provides: "No government shall impose a substantial burden on the religious exercise of a person residing in or

17

confined to an institution, as defined in section 1997 [which includes state prisons], even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). For an RLUIPA claim, the plaintiff-prisoner must show that the government has imposed a substantial burden on his religious exercise, which is a burden that imposes "significantly great restriction or onus upon such exercise." *San Jose Christian Coll. v. Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir. 2004). As with a Free Exercise Clause claim, under RLUIPA, "a prisoner's request for an accommodation of a religious practice must be sincerely based on a religious belief and not some other motivation." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015).

Defendants make a single argument against both the First Amendment and RLUIPA claims. They argue that Mr. Zapata's First Amendment and RLUIPA claims fail because he does not have a sincerely held religious belief. They urge that Mr. Zapata's request for a kosher diet properly was rejected because Mr. Zapata's lack of knowledge regarding his professed faith and its kosher laws, as well as his repeated purchases of nonkosher items, showed that he "did not have a sincerely held religious belief that required him to keep kosher." Docket No. 26 at 12.

Prison officials may examine the sincerity of a prisoner's religious belief before providing him a religious diet. *See generally Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) ("prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic"); *Resnick v. Adams,* 348 F.3d 763, 771 n.8 (9th Cir. 2003) ("It is appropriate for prison authorities to deny a special diet if an inmate is not sincere in his religious beliefs.") (citing *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987)); *Lute v. Jonson*, 2012 WL 913749, *7 (D. Idaho March 16, 2012) ("Although 'backsliding' or nonobservance of a religious practice is not dispositive, it is evidence of a prisoner's religious insincerity . . . Purchasing nonkosher foods—both before and after his kosher diet request—is completely inconsistent with Plaintiff's professed religious belief."). Although Mr. Zapata's purchases of many foods inconsistent with a kosher diet likely would make a strong impact on a jury, it cannot

be said as a matter of law that his canteen activities show that his religious beliefs were insincere.

Although prison officials may examine the sincerity of a prisoner's religious belief and conclude that he is not sincere, it does not follow that they are entitled to summary judgment on that basis. Many courts have determined that the sincerity of a prisoner's religious belief is a question of fact for the jury and that it is inappropriate for a court to grant summary judgment on a First Amendment or RLUIPA claim based on a plaintiff's alleged lack of sincerity. *See Monson v. Steward*, 2017 WL 2882709, *9 (D. Or. July 6, 2017); *Dean v. Corr. Corp. of Am.*, 108 F. Supp. 3d 702, 711 (D. Ariz. 2014) (finding that defendants raised material questions of fact regarding plaintiff's sincerely held beliefs); *Colvin v. Caruso*, 605 F.3d 282, 298 (6th Cir. 2010) (sincerity of prisoner's beliefs does not turn on the prisoner's objective knowledge of his religion); *Johnson v. Nev. Bd. of Prison Comm'rs,* 2013 WL 5428423, at *2-3 (D. Nev. Sept. 26, 2013) (although defendants produced evidence that plaintiff's beliefs were not sincerely held, the question "must ultimately be resolved by the trier of fact"); *White v. Linderman*, 2013 WL 4496364, at *5 (D. Ariz. Aug. 22, 2013) ("'backsliding' or non-observance of a religious practice is not sufficient to establish as a matter of law that [plaintiff] is insincere in his religious beliefs"); *Monts v. Arpaio*, 2012 WL 160246, at *3 (D. Ariz. Jan. 19, 2012) (although plaintiff presented a "weak" case for the sincerity of his religious belief, it still presented a question of fact).

In the present case, there are triable issues of fact as to whether Mr. Zapata's request for a kosher diet was based on a sincere religious belief. There is a triable issue of fact as to whether Mr. Zapata was consuming nonkosher food. Defendants present evidence that he regularly purchased nonkosher food from the prison canteen; Mr. Zapata indicates that he gave nonkosher food away to other inmates. If he consumed nonkosher food, a trier of fact might consider that evidence to decide that Mr. Zapata did not have a sincerely held religious belief in the need to keep kosher. *See McElyea*, 833 F.2d at 196 (whether prisoner was sincere in desiring a kosher diet despite reports of nonkosher food consumption presented a triable issue, defeating summary judgment motion). There also is a triable issue of fact as to whether Mr. Zapata was ignorant of basic principles of kosher diets and his professed religion. Defendants present evidence that suggests that Mr. Zapata did not sufficiently understand the religious beliefs that supposedly

supported his demand for a kosher diet; Mr. Zapata denies that he did not understand the religious belief. Mr. Zapata's CDCR-3030 request form had an attachment in which he discussed his religious practices and need for the kosher diet. If Mr. Zapata lacked basic knowledge about his professed religion and its kosher diet requirements, the trier of fact might conclude that his request for a kosher diet was not based on a sincerely held religious belief. These questions of fact cannot be resolved at the summary judgment stage.

Defendants are not entitled to summary judgment because there are triable issues of fact regarding whether Mr. Zapata had a sincerely held religious belief that he was required to keep kosher to practice his Messianic Jewish religion.

C. <u>Qualified Immunity</u>

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.* If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted)). Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1    The same triable issues of fact about the sincerity of Mr. Zapata's religious beliefs that

2  preclude summary judgment for Defendants on the merits of Mr. Zapata's First Amendment claim

3  also preclude summary judgment in their favor on the qualified immunity defense. Viewed in the

4  light most favorable to Mr. Zapata, the evidence shows that he made a request for a kosher diet

5  and explained that he needed a kosher diet to practice his religion as a Messianic Jew. Taking the

6  evidence in the light most favorable to Mr. Zapata, it would be clear to a reasonable correctional

7  official that a Free Exercise violation would occur by denying a kosher diet to a prisoner who

8  explained that he needed a kosher diet to practice his religion as a Messianic Jew. Although

9  existing case law allowed prison officials to question the sincerity of a prisoner's religious beliefs,

10  the evidence does not so clearly point to Mr. Zapata's religious belief as being insincere that a

11  reasonable official would have understood that he could deny the kosher diet.

12  D.    Referral To *Pro Se* Prisoner Mediation Program

13    This case appears a good candidate for the court's mediation program. Good cause

14  appearing therefor, this case is now referred to Magistrate Judge Illman for mediation or

15  settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The proceedings will

16  take place within 120 days of the date this order is filed. Magistrate Judge Illman will coordinate

17  a time and date for mediation or settlement proceedings with all interested parties and/or their

18  representatives and, within five days after the conclusion of the proceedings, file with the Court a

19  report for the prisoner mediation or settlement proceedings.

20    Plaintiff must attend and participate in the mediation or settlement conference proceedings.

21  The conference may be set up so that he will appear in person, by videoconference or by telephone

22  -- and he must attend whatever format Magistrate Judge Illman chooses. Plaintiff is cautioned that

23  he may be sanctioned for failure to comply with an order to participate in a mediation or

24  settlement conference, and such sanctions may include dismissal of part or all of the action. *See*

25  Fed. R. Civ. P. 16(a), (f), and 41(b).

26                    **VI.    CONCLUSION**

27    For the foregoing reasons, Defendants' motion for summary judgment is **DENIED.**

28  Docket No. 26.

Defendants' motion to strike Plaintiff's reply to their reply brief is **GRANTED**. Docket No. 32. The Local Rules do not allow for a reply to a reply brief. *See* N.D. Local Rule 7-3(d) ("Once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval" other than objections or new legal decisions). Plaintiff did not seek, or obtain, permission to file a reply.

This action is now referred to Magistrate Judge Illman for mediation or settlement proceedings pursuant to the *Pro Se* Prisoner Mediation Program. The Clerk shall send a copy of this order to Magistrate Judge Illman.

**IT IS SO ORDERED**.

Dated: June 13, 2019

EDWARD M. CHEN
United States District Judge